UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────x

STEPHANIE SAILOR,                            **AMENDED**
                                             **COMPLAINT**
      Plaintiff,
                                             04 Civ. 10234 (Berman, J.)
      v.

EISAI, INC.,

      Defendant.
───────────────────────────────────x

      Stephanie Sailor states her complaint against defendant Eisai, Inc., as set forth hereinafter:

**PARTIES, JURISDICTION AND VENUE**

1) Plaintiff Stephanie Sailor resides New Jersey.  Ms. Sailor works within defendant Eisai, Inc.'s Medical Services Department.

2) Eisai, Inc. is a pharmaceutical corporation that does business in Teaneck, NJ and New York, NY.  It is a wholly owned subsidiary of Eisai, Ltd., a Tokyo-based company.

3) The Court has personal jurisdiction over defendant Eisai, Inc. because the company does extensive business within the Southern District of New York with non-party Pfizer, Inc., which markets Eisai's major product Aricept®.  Further, Eisai, Inc.'s medical services department members attend weekly meetings in Manhattan. In November 2004, Eisai, Inc. included plaintiff in an employee teambuilding conference that took place in Manhattan.  Further, in November 2003, Eisai, Inc. filed an action in this Court.

4) The Court has subject matter jurisdiction over this action, pursuant to 29 U.S.C. Section 2615(a)(1*) et seq.*; 29 U.S.C. Section 201 *et seq.*;  29 U.S.C. Section 216(b). The Court has jurisdiction over plaintiff's pendent state and local law claims, pursuant to 28 U.S.C. Section 1367.

5) Venue is proper because one or more events giving rise to this lawsuit occurred in this jurisdiction.

6) Prior to the commencement of this action, a copy of this complaint was filed with the New York City Human Rights Division.

## STATEMENT OF FACTS

7) Plaintiff is an employee of Eisai, Inc. (hereinafter, "Eisai"), pronounced A-Z-EYE. Ms. Sailor has worked for the company since March 2003.  She earns an hourly rate wage.  Her regular work hours are Monday through Friday from 7:30 a.m. to 4:00 p.m.

8) Ms Sailor has multiple physical disabilities, including lumbar degenerative disc disease; lumbar facet syndrome; osteoarthritis; metatarsaliagia; spondylolysis; and thoracic outlet syndrome (hereinafter, "TOS").  Her symptoms include, but are not limited to, walking disability and limited use of her shoulder and back.  In August 2004, Ms. Sailor had surgery related to these disabilities.

9) During the past year, Ms. Sailor has received therapy for emotional issues that concern post traumatic stressors that date as far back as childhood.

10) Eisai public relations mission statement is "human heath care is our goal."

11) Beginning in or about June 2003, Eisai human resources department (hereinafter, "HR") granted Ms. Sailor's request for a reasonable accommodation, pursuant to the Americans with Disabilities Act, 42 U.S.C. Section 12112 *et seq*. (hereinafter, "ADA"). The ADA accommodations included, *inter alia*, a modified work schedule. Ms. Sailor worked on Saturdays and well after 6:00 p.m. during the week. Eisai imposed no restriction on her permission to work unsupervised during those times.

12) Spring 2004, management complained about Ms. Sailor's work schedule. By email dated June 2, 2004, HR director Janis Lane informed Dean Lambe that the "situation is guided by ADA guidelines and cannot be compared to those who are not affected by ADA. Hard pill to swallow for some, but since Stephanie is meeting her workload, doing a good quality job, making up her times as she can – there really is no issue here."

13) In or about July 2004, Ms. Sailor complained to management of alleged child abuse infractions and boastings by a coworker, and alleged that there was a hostile work environment. Ultimately, management informed Ms. Sailor that there was no hostile work environment. However, Ms. Sailor sought and received professional emotional therapy, as these hostile work environmental issues triggered an adverse reaction in Ms. Sailor.

14) In July 2004, Ms. Sailor informed HR that she planned to have surgery in August. She submitted a formal application for leave, pursuant to the Family and Medical Leave Act ("FMLA"). HR rejected Ms. Sailor's submission, and told her to wait until September to apply.

15) Eisai has a strict written FMLA policy. It purports to guarantee Eisai employees confidentiality. The policy provides, *inter alia*, that only human resources managers are entitled to obtain medical disclosures from employees.

16) Within days following the rejection of Ms. Sailor's FMLA application, HR requested a physician's note from Ms. Sailor detailing the "exact" nature of her medical treatments and stating an opinion as to the likely effect of the treatments on Ms. Sailor's work. HR told her to share the information with her supervisors. This suggestion violated policy. But, Ms. Sailor made the disclosure.

17) Ms. Sailor had surgery in August, and, thereafter, convalesced for about one month.

18) On September 16, 2004, Ms. Sailor returned to work. Eisai terminated Ms. Sailor's ADA reasonable accommodations/modified work schedule.

19) Ms. Sailor's managers informed her that she would need to apply for FMLA intermittent leave to enable her to undergo medical treatment during work hours. Ms. Sailor made application to HR for FMLA intermittent leave. In the ensuing month long period, HR met with Ms. Sailor and her managers, and set new terms of employment.

20) In the months prior to her surgery, Ms. Sailor's managers intended to promote her. However, effective September 22, 2004, they reassigned Ms. Sailor from her job position as "Medical Communications Administrative Assistant" to "Customer Support Technology Specialist." As it turned out, the new position was "banded lower" than the former position. In effect, Eisai demoted Ms. Sailor. However, management misrepresented to Ms. Sailor that it was a promotion and that they would

keep her on an hourly wage scale in order to enable her to continue to accrue overtime wages.

21) On October 13, 2004, Mr. Lambe and Ms. Deutche informed Ms. Sailor that, upon the commencement of the FMLA intermittent leave plan, she would no longer be welcome in the workplace evenings or Saturdays, unless either of them is present with her. The rationale was that Ms. Sailor could fall down and that "the legal department thinks you're a liability." Mr. Lambe added, "They are afraid you might fall at work when nobody is around."

22) This policy suggests that Ms. Sailor is unfit to work on an independent basis. It interferes with Ms. Sailor's image as an employee who has management potential, and effectively segregates Ms. Sailor from other Eisai workers.

23) On or about October 26, 2004, Ms. Sailor's FLMA intermittent leave took effect. Mr. Lambe informed Ms. Sailor that she could no longer remain on the work premises after her regular work hours nor could she earn overtime wages. Mr. Lambe added, "There is no negotiating on this new policy . . . [Don't] push it too far ….[because] HR thinks you're a troublemaker."   Ms. Sailor expressed her concern that this new policy restricted her ability to perform her work; ran contrary to Eisai's corporate mission statement; and inadequately accommodated her disabilities.

24) Since October 2004, manger Deutche has required Ms. Sailor to post onto a computer network her daily work hours and medical appointments, which information is now available for many employees to examine. Formerly, Eisai formerly afforded Ms. Sailor some privacy by permitting her to present to Ms. Deutche time records that Ms. Sailor would prepare and print out from her work station's personal computer.

25) By the end of October 2004, Mr. Lambe and Ms. Deutche began to openly express frustration with Ms. Sailor for verbalizing concerns about the negative effects of her new work restrictions on her ability to perform her work on a timely basis, to accommodate her disabilities and to earn a gainful salary.

26) In November 2004, the Medical Services Department conducted a teambuilding conference in Manhattan.  Employees and managers traveled by boat from New Jersey to Manhattan and then traveled by bus to their meeting place.  Ms. Sailor reminded Ms. Deutche that, due to her walking disability, it would be too far for her to walk to the pier and that she wanted to take the group's bus to the pier.  Nevertheless, at the end of the conference, Ms. Deutche had the bus depart without Ms. Sailor.

27) On November 17, 2004, Eisai verbally honored Ms. Sailor with an employee *Innovations* award for her work.  Ms. Sailor prevailed over Eisai employees who have significantly more seniority on the corporate ladder.  Based on information and belief, Eisai has withheld the prizes that go with the award; namely, money and a trip to Japan.  Ms. Sailor believes that management has retaliatory animus, and is fearful to have her travel.

28) On November 19, 2004, and again on November 22, 2004 (at 2:00 p.m.), Eisai received telephonic notice of Ms. Sailor's claims against it for disability discrimination and retaliation; FMLA violations and retaliation; and overtime violations.

29) On November 22, 2004, from 2:30 p.m. until 3:30 p.m., management met with Ms. Sailor.  Ms. Deutch gave Ms. Sailor a "verbal warning" of poor work performance,  Mr. Lambe asked Ms. Sailor whether she intended to hold the company "hostage" to the ADA reasonable

accommodation policy; Ms. Sailor responded that she merely wanted to have the company reinstate her previous disability accommodations and modified work schedule; Ms. Deutche began to yell criticisms at Ms. Sailor; and Ms Deutche concluded the meeting with a promise to send Ms. Sailor a "written warning" of poor work performance.

30) The same day, by memorandum, Eisai's management shifted position, so as to now permit Ms. Sailor to work Saturdays and on weekdays "past 6:00 p.m. with approval from [management] and if [management] is present."

31) Eisai took employment actions against Ms. Sailor because she sought to have the company reinstate disability accommodations formerly provided to her, and because she indicated that she would pursue discrimination, retaliation and overtime wage claims against the company.

32) Since November 23, 2004, Eisai's position has been that, because Eisai changed Ms. Sailor's job title, the company is entitled to require her to participate anew in an interactive process to identify reasonable accommodations and that the present arrangements reasonably accommodate her.

33) On or about October 28, 2004, Ms. Deutche demanded that Ms. Sailor must remove from her timecard the entry for work performed from 6:00 p.m. to 7:00 p.m. on Tuesday, October 26th.  Also, Ms. Deutche reminded Ms. Sailor that she is unauthorized to work after 6:00 p.m.  Ms. Sailor removed the time entry for October 28th and for other dates, and Eisai paid Ms. Sailor no salary for said work.  To date, Ms. Sailor refrains from posting on the company's computer network records of any unauthorized time that she performs work assignments on behalf of her department.

34) In October 2004, Ms. Sailor began work on a corporate project that was to launch on December 3, 2004.  The project was to benefit a local nonprofit organization.  The

7

corporate public relations department allocated $700.00 towards "Paintfest," a project that was Ms. Sailor's brainchild.

35) To implement the project, the medical services department took steps to ensure that Ms. Sailor worked on the project on its behalf. Senior manager Lambe exchanged multiple emails with Ms. Sailor. He encouraged her to collaborate with Ms. Deutche and coworkers. In or about early November, however, manager Ms. Deutche informed Ms. Sailor that she (Ms. Sailor) would have to work on the Paintfest project on her own time and that the company no longer would pay her for work on that project. Ms. Deutche instructed Ms. Sailor to refrain from recording time spent on Paintfest.

36) It remained clear to Ms. Sailor that she was expected to complete the project on a timely basis and that her managers planned to judge her performance on the Paintfest project. Ms. Sailor began to utilize her own time to develop and to execute Paintfest. From early November until December 3, 2004, Ms. Sailor would use her personal cell phone to make calls pertaining to the project; would work on the project before her ordinary workday began at 7:30 p.m. and after her workday ended at 4:00 p.m.; and would use her lunch hour to conducted telephonic and in-person meetings with employee-project participants.

37) On December 3, 2004, in an effort to ensure the successful completion of the project, Ms. Sailor also used her morning fifteen-minute break to meet with the nonprofit organization's representative on the day of the event. The Paintfest project launched according to plan. Mr. Lambe commended Ms. Sailor for her work on Paintfest. Ms.

Sailor is glad to have worked on Paintfest, but she regrets the schedule constraints and wage deprivations to which her employer subjected her.

38) Concerning the *Innovations* merit award of November 2004, on December 3, 2004, Eisai issued a certificate naming Ms. Sailor, but failed to present it to her until sometime in March 2005. Eisai has recognized past (able bodied) winners of this merit award by publishing their photographs and printing an article about them in the company newsletter, by presenting a cash prize to them, and sending them on a business trip to the parent company in Japan. To date, Eisai has given no such recognition to Ms. Sailor.

39) On or about December 17, 2004, Ms. Sailor made new requests for reasonable accommodations of her disabilities. HR and her managers flatly rejected her requests, and denied her the benefit of a good faith evaluation of her requests for reasonable accommodations. During the same meeting, Mr. Lambe gave Ms. Sailor another verbal, disciplinary warning.

40) Ms. Sailor had hip surgery on January 12, 2005. She convalesced thereafter.

41) On February 25, 2005, Ms. Sailor's surgeon wrote a note authorizing her to return to work, and stating that, as a matter of "medical necessity," Eisai needed to provide to her (a) a modified work schedule; (b) "flexibility" to work from a reclining body position; and (c) a laptop computer. The doctor's note was submitted the same day to counsel for Eisai, together with letter notifying the company that Ms. Sailor would return to work on Monday, February 28, 2005. The letter also contained a specific request to permit Ms. Sailor the flexibility of working from a seated or reclining body position, and to provide her with a sofa or *chaise lounge* furniture, as necessary.

42) On February 28, 2005, management refused to make the accommodations per the surgeon's recommendations. In email to Ms. Sailor, human resources director Janis Lane argued, *inter alia*, that, in 2003, Eisai made accommodations for her with the assistance of an ergonomics consultant and that, therefore, Ms. Sailor presently must work from her existing workstation and desktop computer. Ms. Sailor's position is that Eisai's reasonable accommodation of her upper body disabilities in 2003 does not absolve of its obligation in 2005 to make a reasonable accommodation of her hip and lower body disabilities.

43) During early March 2005, management required Ms. Sailor to travel to another floor (forth floor) to use a sofa, despite the fact that her department has a empty room designated as a "privacy" or "nipple" room for able-bodied female workers. Management seemed unresponsive to Ms. Sailor's complaints that the distance to the new floor was too far and strenuous and that it was intimidating for her (a) to have to walk by an armed worker to gain access to the sofa, (b) walk past lawyer's offices to use the restroom on the fourth floor; and (c) to be relegated to the status of a mere guest on account that management required her to go to a designated "guest" room to recline, and refused to permit her to work in said guest room.

44) Due to her limited opportunities in early March to work from a reclining or prone body position, Ms. Sailor suffered excruciating bodily pains, so much so that she was out ill on a number of dates due to the physical pains that she would endure in the workplace.

45) Further, in July 2004, Ms. Sailor provided notice to the human resources department and her managers that she had obtained a handicap parking permit, and need such

parking privileges in the office building. At the time, management informed her that she would have to directly contact the sole other handicapped employee, and arrange to trade off days to use the company's single designate handicap parking spot.

46) Following her January 2005 hip surgery, Ms. Sailor renewed her request for handicap parking. The request was through counsel by letter dated February 25, 2005. To date, Eisai has failed to grant the accommodation. Ms. Sailor has suffered physical pain and even injury in walking extended distances within the parking lot and from her parked car into the building.

47) Based on Eisai's refusal and/or delays in accommodating Ms. Sailor's disabilities in the period following her surgeries in August 2004 and January 2005, Ms. Sailor's rehabilitation has been compromised, and she has suffered unnecessary additional, physical pain and suffering.

48) To date, Ms. Sailor has suffered and continues to suffer pecuniary and personal losses as a result of Eisai's acts and omissions.

### FIRST CAUSE OF ACTION:
### FAILURE TO MAKE REASONABLE ACCOMMODATIONS

49) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 37.

50) Eisai is liable to Ms. Sailor for violating state and local law that govern reasonable accommodations for disabled persons, pursuant to New York and New Jersey state and local laws, including, but not limited to, New York Exec. Laws § 296 et seq. and N.Y.C. Administrative Code § 8-107 et seq., namely, New York Human Rights Laws ("NYHRL").

## SECOND CAUSE OF ACTION:
## DISABILITY DISCRMINATION

51) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 39.

52) Eisai is liable to Ms. Sailor for violating state and local laws that prohibit disability discrimination, pursuant to applicable state and local laws, including but not limited to the NYHRL.

## THIRD CAUSE OF ACTION:
## DISABILITY RETALIATION

53) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs1 to 41.

*54)* Eisai is liable to Ms. Sailor for violating state and local law that prohibit disability retaliation, pursuant to applicable state and local laws, including, but not limited to, the NYHRL.

## FOURTH CAUSE OF ACTION:
## INTERFERENCE WITH FAMILY AND MEDICAL LEAVE ACT

55) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 43.

**56)** Eisai is liable to Ms. Sailor for interfering with, restraining and denying the attempt to exercise a right, provided under the Family and Medical Leave Act, 29. U.S.C. Section 2615(a)(1).

## FIFTH CAUSE OF ACTION:
## FAMILY AND MEDICAL LEAVE ACT RETALIATION

57) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 45.

58) Eisai is liable to Ms. Sailor for taking employment actions against her under circumstances giving rise to an inference of retaliatory animus, in violation of The Family and Medical Leave Act of 1993, 29 U.S.C. Section 2615 et seq.

## SIXTH CAUSE OF ACTION:
## FAIR LABOR STANDARDS ACT

59) Ms. Sailor herein reasserts and incorporates by reference the allegations set forth in paragraphs 1 to 47.

60) At all times relevant to this action, Eisai knew that plaintiff is a non-exempt employee under The Fair Labor Standards Act of 1938, 29 U.S. C. Section 201 *et seq*.

61) Eisai is liable to plaintiff for intentionally and willfully failed to properly remunerate her, pursuant to federal and state statutes governing minimum wages and overtime compensation, including but not limited to, The Fair Labor Standards Act of 1938, Section 7, 29 U.S. C. Sections 206 and 207.

## PRAYER FOR RELIEF

62) WHEREFORE, Plaintiffs demand a TRIAL BY JURY;

63) AND WHEREFORE, Plaintiffs seek relief against defendant Eisai, Inc in the following form and to the following extent:

a)  actual damages in an amount to be determined at trial;

b)  compensatory damages in an amount to be determined at trial;

c)  punitive damages in an amount to be determined at trial;

d)  unpaid wages;

e)  unpaid overtime wages;

f)  liquidated damages in the an additional equal amount of the unpaid overtime,

      pursuant to 29 U.S.C. Section 206(b), as well as state law;

g)      reasonable attorney fees;

h)      costs and disbursements; and

i)      such other and further legal and equitable relief as the court deems just and proper.

DATED:      New York, NY
                 March 15, 2005

                                                /s/_____
                                                Chinyere Okoronkwo, Esq. (CO3349)
                                                Attorney for Plaintiff
                                                Law Office
                                                40 East 94th Street, Suite 2K
                                                New York, NY 10128
                                                (212)944-1320 (917)817-6528